IN THE CIRCUIT COURT FOR PINELLAS COUNTY, FLORIDA
CIRCUIT CIVIL NO. _07-12532-CI-8_

WILLIAM R. NOBLE, JR,

      Plaintiff,

UCN#522007CA 0/2533xx CICT

vs.

PRISON REHABILITATIVE INDUSTRIES AND
DIVERSIFIED ENTERPRISES, INC.
d/b/a PRIDE ENTERPRISES; INDUSTRIES
TRAINING CORPORATION; and TODD M.
MEZRAH & ASSOCIATES, INC. d/b/a MEZRAH
CONSULTING,

      Defendants.



_____/

### COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, WILLIAM R. NOBLE, JR, by and through his undersigned attorneys, sues Defendants, PRISON REHABILITATIVE INDUSTRIES AND DIVERSIFIED ENTERPRISES INC., a Florida non-profit corporation d/b/a PRIDE ENTERPRISES ("PRIDE"), INDUSTRIES TRAINING CORPORATION, a Florida non-profit corporation ("ITC"), and TODD M. MEZRAH & ASSOCIATES, INC., a Florida corporation d/b/a MEZRAH CONSULTING, ("Mezrah"), and alleges that:

### GENERAL ALLEGATIONS

1.     This is an action for damages in excess of $15,000, exclusive of interest, costs and attorney's fees.

2.     PRIDE is a Florida non-profit corporation doing business as Pride Enterprises in Pinellas County, Florida.

4.     ITC is a Florida non-profit corporation doing business in Pinellas County, Florida. PRIDE operated and controlled ITC.



EXHIBIT
Composite
A

5       Mezrah is a Florida corporation doing business in Hillsborough County, Florida.

6.      PRIDE and ITC were and are the alter egos and mere instrumentalities of each other, ignoring their purported separate corporate identities, sharing and transferring between the two assets without regard to ownership, being controlled by persons holding officerships and duties in both entities and otherwise engaging in improper conduct in the use of the corporations' identities and operations.  Defendants failed to observe corporate formalities, did not recognize the existence of ITC as a corporation in their own dealings, and did not operate independently of each other.

7.      On or about October 1, 2001, PRIDE and ITC, created a Supplemental Executive Retirement Plan ("SERP") of which Plaintiff became a vested participant, a copy of which is attached as Exhibit "1".

8.      On or about March 14, 2002, Pamela Jo Davis, then President of PRIDE and ITC, executed a Separation Agreement and Release ("Separation Agreement") with Plaintiff on behalf of said defendants and their present, past, and future affiliates, predecessors, heirs, successors, assigns, insurers, employers, parents, and subsidiaries, a copy of which is attached as Exhibit "2".  Paragraph 10 of the Separation Agreement states "ITC/PRIDE agrees that Noble shall maintain his vested interest in ITC's SERP plan".

9.      On or about March 14, 2002, prior to his execution of the Separation Agreement, Plaintiff contacted Mezrah, the administrator of the SERP.   Mezrah informed Plaintiff that his SERP funds had been placed in a trust fund.  Said Defendant

also informed Plaintiff that the program was guaranteed and that nothing would affect the program as it related to Plaintiff.

10.    Plaintiff relied upon said representations of Mezrah in executing the Separation Agreement.

11.    On or about November 21, 2006, Plaintiff contacted PRIDE to advise of a change of his address.  PRIDE informed Plaintiff that the SERP had been terminated in March of 2005.

12.    On or about March 12, 2007, Mezrah informed Plaintiff that the SERP was terminated around March 2005 and that Mezrah had a difficult time contacting ITC/PRIDE personnel.

13.    All conditions precedent necessary to the maintenance of these causes of action have occurred, been performed, excused, or waived.

14.    Plaintiff has employed the undersigned attorneys and is obligated to pay them a reasonable fee for their services rendered herein.

## COUNT I – CIVIL ENFORCEMENT ACTION
## UNDER 29 U.S.C § 1132(a)(1)(B) (ERISA)

15.    Plaintiff realleges paragraphs 1 through 14 above.

16.    As a vested participant in the SERP, Plaintiff is authorized under 29 U.S.C. § 1132(a)(1)(B) to bring a civil action to recover benefits due under the terms of the employee benefit plan of which he was a participant.

17.    Article VII section (b)(2) of the SERP states that "upon termination of the plan the Participants (or their Beneficiaries) shall be paid in a lump sum equal to the Actuarial Present Value of the Participant's Accrued Benefit, as soon as administratively practicable following termination".

18. The SERP was terminated on or about March of 2005 and, to date, Plaintiff has not received his compensation as required by Article VII of the SERP.

WHEREFORE, Plaintiff WILLIAM R. NOBLE, JR., demands judgment against Defendants, PRIDE and ITC, jointly and severally, for compensation owed under the SERP, interest, court costs, reasonable attorney's fees and for such other relief as the Court deems appropriate.

## COUNT II – BREACH OF CONTRACT

19. Plaintiff realleges paragraphs 1 through 14 above.

20. PRIDE and ITC have breached the Separation Agreement by failing to comply with paragraph 10. Specifically, PRIDE and ITC breached the Separation Agreement by terminating or permitting the termination of the SERP in or about March 2005 without compensating Plaintiff for his interest guaranteed by paragraph 10 of the Separation Agreement.

21. As a result, Plaintiff has been materially injured.

WHEREFORE, Plaintiff, WILLIAM R. NOBLE, JR., demands judgment against Defendants, PRIDE and ITC, jointly and severally, for damages, interest, court costs, reasonable attorney's fees, and for such other relief as the Court deems appropriate.

## COUNT III – NEGLIGENT MISREPRESENTATION

22. Plaintiff realleges paragraphs 1 through 14 above.

23. Mezrah in the course of its business, supplied false information for the guidance of Plaintiff regarding his interest and due compensation under the SERP. Specifically, on or about March 14, 2002, Mezrah negligently made false representations to Plaintiff regarding the placement of Plaintiff's SERP funds in a trust.

Furthermore, Mezrah negligently informed Plaintiff that the program was guaranteed and that nothing would affect the program as it related to Plaintiff.

24.    Plaintiff relied on said representations to his detriment and as a direct result was materially injured.

WHEREFORE, Plaintiff, WILLIAM R. NOBLE, JR., demands judgment against Defendant, Mezrah, for damages, interest, court costs, and for such other relief as the Court deems appropriate.

### DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury on all claims so triable.

Dated this 29th Day of November, 2007.

STEPHEN J. WEIN, ESQUIRE
FBN: 212814 / SPN: 2562
BATTAGLIA, ROSS, DICUS & WEIN, P.A.
980 Tyrone Boulevard
Post Office Box 41100
St. Petersburg, Florida 33743-1100
Telephone No. (727) 381-2300
Facsimile No. (727) 343-4059
ATTORNEYS FOR PLAINTIFF

07-0201 / 440505

5

# INDUSTRIES TRAINING CORPORATION
## SUPPLEMENTAL EXECUTIVE RETIREMENT PLAN

### EFFECTIVE
### AS OF
### OCTOBER 1, 2001

KALISH & WARD, P.A.
TAMPA, FL

EXHIBIT

tabbies®

1

# INDUSTRIES TRAINING CORPORATION
# SUPPLEMENTAL EXECUTIVE RETIREMENT PLAN

### EFFECTIVE
### AS OF
### OCTOBER 1, 2001

|  |  | Page |
|---|---|---|
| ARTICLE I | Definitions | II-1 |
| ARTICLE II | Administration | III-1 |
| ARTICLE III | Eligibility and Participation | IV-1 |
| ARTICLE IV | Benefits | V-1 |
| ARTICLE V | Financing | VI-1 |
| ARTICLE VI | Amendment and Termination | VII-1 |
| ARTICLE VII | Miscellaneous | VIII-1 |

## INDUSTRIES TRAINING CORPORATION
## SUPPLEMENTAL EXECUTIVE RETIREMENT PLAN

### PURPOSE

Industries Training Corporation (the "Employer") hereby establishes, effective as of October 1, 2001 the Industries Training Corporation Supplemental Executive Retirement Plan (the "Plan") to retain and reward a select group of management or highly compensated employees of the Employer or a Related Employer. The Plan is an unfunded plan established and maintained for the primary purpose of providing certain key employees who substantially contribute to the success of the Employer or a Related Employer with the opportunity to defer the receipt of compensation. The Plan is a non-qualified deferred compensation plan that is intended to be governed by Section 457(f) of the Code.

### ARTICLE II

### Definitions

Whenever used hereinafter, the following terms shall have the meaning set forth below.

(a)    **"Accrued Benefit"** shall mean, at any particular time, a Participant's supplemental retirement benefit based on his Years of Service and Highest Average Compensation, as described in paragraph (a) of Article IV; provided, however, that a Participant with less than 10 Years of Service shall have no Accrued Benefit under the Plan.

(b)    **"Actuarial Equivalent"** shall mean a benefit of equivalent current value to the benefit that would otherwise have been provided to the Participant, determined in accordance with the rules established by the Plan Administrator and on the basis of the actuarial methods and actuarial assumptions set forth in the Pride Defined Benefit Pension Plan.

(c)    **"Actuarial Present Value"** shall mean, with respect to determining the amount of a lump sum amount under this Plan, an amount determined by using a nine percent (9%) discount rate.

(d)    **"Beneficiary"** shall mean the person or persons designated by a Participant in writing who are to receive any benefits under the Plan after the Participant's death. If the Participant does not select a Beneficiary under this Plan on forms provided for that purpose, the Participant's Beneficiary shall be the Participant's estate.

(e)    **"Code"** shall mean the Internal Revenue Code of 1986, as it may be amended from time to time, or any successor statute. Reference to a specific section of the Code shall include a reference to any successor provision.

(f)     "**Compensation**" shall mean wages received by a Participant from the Employer or a Related Employer that are reportable on Form W-2, plus any salary reduction contributions made pursuant to a plan described in Section 125, Section 401(k) or Section 403(b) of the Code.

(g)     "**Consulting Obligation**" shall mean the obligation of the Participant to perform consulting services for the Employer or a Related Employer for a term agreed to pursuant to paragraph (h) of Article IV (not to exceed 5 years), commencing on the last day of his Vesting Period, for a minimum of 250 hours during each year thereof.

(h)     "**Constructive Discharge**" shall mean the voluntary termination of employment of a Participant on account of:

(1)     A reasonable determination by the Participant that, as a result of a change in circumstances significantly affecting the Participant's position, the Participant is unable to exercise the authority, power, function or duties attached to the Participant's position;

(2)     A reduction in the Participant's rate of base salary; or

(3)     A change of the principal location(s) at which the Participant is required to perform services hereunder to a location more than 25 miles from his principal location.

(i)     "**Effective Date**" of the Plan shall mean October 1, 2001.

(j)     "**Employer**" means Industries Training Corporation and its successors.

(k)     "**Highest Average Compensation**" shall mean the amount determined by dividing the sum of the Participant's Compensation for the highest five calendar years by five.

(l)     "**Participant**" shall mean any employee of the Employer or a Related Employer who is covered by this Plan as provided in Article III.

(m)     "**Plan**" shall mean the Industries Training Corporation Supplemental Executive Retirement Plan hereby created and as it may be amended from time to time.

(n)     "**Plan Administrator**" shall mean the Employer.

(o)     "**Plan Year**" shall mean the period beginning October 1, 2001 and ending December 31, 2001; thereafter, the 12-month period ending each December 31.

(p)     "**Related Employer**" shall mean an affiliate of the Employer that the Employer, in its sole discretion, allows to participate in the Plan.

(q)     "**Termination for Cause**" shall mean

     (1)     the involuntary termination of a Participant's employment with an Employer or a Related Employer on account of the Participant's:

          (A)     knowingly engaging in acts or omissions constituting dishonesty, intentional breach of fiduciary obligation or intentional wrongdoing or malfeasance within the scope of the Participant's employment with the Employer or a Related Employer;

          (B)     conviction of a criminal violation involving fraud or dishonesty within the scope of the Participant's employment with the Employer or a Related Employer; or

          (C)     gross dereliction of duty within the scope of the Participant's employment with the Employer or a Related Employer after having been provided with written notice and a 30-day period to cure.

     (2)     Notwithstanding the foregoing, Termination for Cause shall not include:

          (A)     any personal or policy disagreement between the Participant and the Employer or a Related Employer; or

          (B)     any action taken by the Participant in connection with the Participant's duties if the Participant acted in good faith and in a manner the Participant reasonably believed to be in, and not opposed to, the best interest of the Employer or Related Employer, and the Participant had no reasonable cause to believe such conduct was unlawful.

(r)     "**Year of Service**" shall mean each 12-month period of employment with the Employer or a Related Employer; provided, further, that periods of employment of less than 12 months may be aggregated to complete a Year of Service. For this purpose, the term of any Consulting Obligation shall not be taken into account in determining Years of Service.

(s)     "**Vesting Period**" shall mean the period determined by the Participant and the Plan Administrator in accordance with paragraph (f) of Article VI.

## ARTICLE III

### Administration

(a)     **Plan Administrator.**

(1)    The Plan Administrator shall have complete control and discretion to manage the operation and administration of the Plan, with all powers necessary to enable it to carry out its duties in that respect. Not in limitation, but in amplification of the foregoing, the Plan Administrator shall have the following powers:

(A)    To determine all questions relating to the eligibility of employees to participate or continue to participate;

(B)    To maintain all records and books of account necessary for the administration of the Plan and establish such accounting procedures as are necessary to administer the Plan;

(C)    To interpret the provisions of the Plan and to make and to publish such interpretive or procedural rules as are not inconsistent with the Plan and applicable law;

(D)    To compute, certify and arrange for the payment of benefits to which the Participant or any Beneficiary is entitled;

(E)    To process claims for benefits under the Plan by the Participant or any Beneficiary;

(F)    To engage consultants and professionals to assist the Plan Administrator in carrying out its duties under this Plan; and

(G)    To develop and maintain such instruments as may be deemed necessary from time to time by the Plan Administrator to facilitate payment of benefits under the Plan.

(2)    The Plan Administrator may designate employees of the Employer to assist the Plan Administrator in the administration of the Plan and perform the duties required of the Plan Administrator hereunder.

(b)     **Plan Administrator's Authority.**    The Plan Administrator may consult with Employer's officers, legal and financial advisers and others, but nevertheless the Plan Administrator shall have the full authority and discretion to act, and the Plan Administrator's actions shall be final and conclusive on all parties.

(c)     **Claims and Appeal Procedure for Denial of Benefits.**    A Participant or a Beneficiary ("Claimant") may file with the Plan Administrator a written claim for benefits if the Participant or Beneficiary determines the distribution procedures of the

Plan have not provided him his proper interest in the Plan. The Plan Administrator must render a decision on the claim within a reasonable period of time of the Claimant's written claim for benefits. The Plan Administrator must provide adequate notice in writing to the Claimant whose claim for benefits under the Plan the Plan Administrator has denied. The Plan Administrator's notice to the Claimant must set forth:

        (1)    The specific reason for the denial;

        (2)    Specific references to pertinent Plan provisions on which the Plan Administrator based its denial;

        (3)    A description of any additional material and information needed for the Claimant to perfect his claim and an explanation of why the material or information is needed; and

        (4)    That any appeal the Claimant wishes to make of the adverse determination must be made in writing to the Plan Administrator within sixty (60) days after receipt of the Plan Administrator's notice of denial of benefits. The Plan Administrator's notice must further advise the Claimant that his failure to appeal the action to the Plan Administrator in writing will render the Plan Administrator's determination final, binding and conclusive. The Plan Administrator's notice of denial of benefits must identify the name and address of the Plan Administrator to whom the Claimant may forward his appeal.

If the Claimant should appeal to the Plan Administrator, he, or his duly authorized representative, must submit, in writing, whatever issues and comments he, or his duly authorized representative, believes are pertinent. The Claimant, or his duly authorized representative, may review pertinent Plan documents. The Plan Administrator will re-examine all facts related to the appeal and make a final determination as to whether the denial of benefits is justified under the circumstances. The Plan Administrator must advise the Claimant of its decision within a reasonable period of time of the Claimant's written request for review.

## ARTICLE IV

### Eligibility and Participation

(a)   **Eligibility**.  The Employer or a Related Employer, in its sole discretion, shall determine those employees of the Employer or the Related Employer eligible to participate in the Plan.  An employee, who, in the opinion of the Employer or Related Employer, has contributed significantly to the growth and successful operations of the Employer or a Related Employer will be eligible to become a participant.

(b)   **Participation**.  An eligible employee shall become a Participant upon notification from the Employer or Related Employer.

## ARTICLE V

### Benefits

(a)   **Supplemental Retirement Benefit**.   The Participant's supplemental retirement benefit shall be determined as an annual benefit, payable over a 15-year period, equal to the percentage of the Participant's Highest Average Compensation determined in subparagraph (1), offset by the amount described in subparagraph (2) as follows:

(1)   The percentage of the Participant's Highest Average Compensation shall be based upon his Years of Service as set forth below:

| Years of Service | Percentage of Highest Average Compensation |
|---|---|
| At least 10 Years of Service | 40% |
| At least 11 Years of Service but less than 16 Years of Service | 45% |
| At least 16 Years of Service but less than 20 Years of Service | 50% |
| More than 20 Years of Service | 60% |

(2)   The Actuarial Equivalent of the Participant's accrued benefit under (A) the Pride Defined Benefit Pension Plan, and (B) any other tax-qualified (including Section 403(b) of the Code) retirement plan maintained by an Employer or a Related Employer, but only to the extent such accrued benefit is attributable to contributions made by an Employer or a Related Employer (other than elective contributions), at the time the Participant's supplemental retirement benefit under this Plan commences.

(b)   **Timing and Form of Benefit Payment**.

(1)   The distribution of a Participant's vested interest in his Accrued Benefit shall be paid as soon as administratively practicable following the earlier of:

(A)   the last day of a Vesting Period; or

(B)   the Participant's termination of employment with the Employer or a Related Employer due to his disability or death, or an event described in paragraph (e)(1) or (e)(2).

V-1

(2)     The Participant's Accrued Benefit shall be paid in the form of:

      (i)      A single lump sum payment of the Actuarial Present Value of the Participant's Accrued Benefit; or

      (ii)     Subject to the discretion of the Plan Administrator, if a Participant agrees at least 13 months prior to the end of his Vesting Period that he will terminate employment with the Employer or a Related Employer as of the end of the Vesting Period and provide consulting services pursuant to a Consulting Obligation, payment will be made in annual installments over the term of the Consulting Obligation (not to exceed 5 years) as set forth in paragraph (h) below.

(c)     **Disability Benefit**

      (1)     In the event the Participant's employment with the Employer or Related Employer is terminated by reason of his disability, such Participant shall be fully vested and entitled to a supplemental retirement benefit, paid in accordance with paragraph (b), in an amount equal to the Actuarial Present Value of his Accrued Benefit determined as of the date of his termination of employment.

      (2)     The term "disability" shall mean the inability of a Participant to perform the usual duties of his employment with the Employer or a Related Employer as determined in the discretion of the Plan Administrator.

(d)     **Death Benefit**.  In the event of the death of a Participant prior to the commencement of his benefit, the Participant's Beneficiary shall be entitled to a death benefit, paid in accordance with paragraph (b), in an amount equal to the Actuarial Present Value of his Accrued Benefit determined as of the date of his death.

(e)     **Termination of Employment**.

      (1)     In the event a Participant's employment with the Employer or a Related Employer is involuntarily terminated without cause prior to the end of his Vesting Period, the Participant shall be fully vested in his Accrued Benefit.

      (2)     In the event a Participant voluntarily terminates employment with the Employer or a Related Employer prior to the end of his Vesting Period on account of a Constructive Discharge, the Participant shall be fully vested in his Accrued Benefit

      (3)     In the event a Participant voluntarily terminates his employment with the Employer or a Related Employer prior to the end of his Vesting Period without experiencing a Constructive Discharge, the Participant shall forfeit his Accrued Benefit.

(4)    In the event a Participant terminates employment with the Employer or a Related Employer by reason of a Termination for Cause, prior to the end of his Vesting Period, the Participant shall forfeit his Accrued Benefit.

(f)    **Vesting Period; Extension of Vesting Period**.

(1)    (A)    A Participant's Accrued Benefit shall be considered fully vested and nonforfeitable when the Participant has continued employment with the Employer or a Related Employer for a period agreed to by the Participant and the Plan Administrator (the "Vesting Period") at the time the Participant commences participation in the Plan. The Vesting Period shall be set forth in a written instrument signed by the Participant and the Plan Administrator.

(B)    The Vesting Period shall be measured from the date a Participant is eligible to participate in this Plan and the minimum Vesting Period shall be two years.

(C)    Notwithstanding the foregoing, a Vesting Period will be deemed to end upon the occurrence of an event that results in full vesting.

(2)    A Participant and the Plan Administrator may jointly make a one-time, irrevocable election to extend the Vesting Period. Such election must be made at least thirteen (13) months prior to the date on which the Vesting Period otherwise would have ended in accordance with the original applicable Vesting Period election. Any extension of the Vesting Period may not be less than 2 years, measured from the end of the original Vesting Period.

(3)    If a Participant and the Plan Administrator elect to extend the Vesting Period in accordance with paragraph (f)(2) above, the provisions of this Plan shall apply as if the Vesting Period would have originally expired on the extended date. It is intended that a timely election to extend the Vesting Period shall not entitle the Participant to have any nonforfeitable right to receive, or beneficial interest in, his Accrued Benefit or any asset of an Employer or a Related Employer on the date specified in any election in effect before the election to extend in accordance with paragraph (f)(2).

(g)    **Tax Withholding**. The Employer may withhold, or require the withholding from any benefit payment which it is required to make, any federal, state or local taxes required by law to be withheld with respect to a benefit payment and such sum as the Employer may reasonably estimate as necessary to cover any taxes for which the Employer may be liable and which may be assessed with regard to such payment. Upon discharge or settlement of such tax liability, the Employer shall distribute the balance of such sum, if any, to the Participant, or if the Participant is then deceased, to the Beneficiary of the Participant. Prior to making any payment hereunder, the Employer may require such documents from any taxing authority, or may require such

V-3

indemnities or surety bond, as the Employer shall reasonably deem necessary for its protection.

(h)    **Payment Under Consulting Obligation.**

(1)    (A)    Subject to paragraph (b) above, the Actuarial Present Value of the Participant's Accrued Benefit shall be payable to the Participant in annual installments commencing on his termination of employment date and thereafter on each of the anniversary of his termination of employment date for the term of the Consulting Obligation. The amount of each installment payment shall be calculated by dividing the Actuarial Present Value of the Participant's Accrued Benefit as of the initial payment date by the number of installment payments remaining to be made (including the installment payment which is then being made).

(B)    Notwithstanding anything in (A) above, the Participant shall be entitled to an installment payment after the first payment only if:

(i)    his performance of services during the prior 12-month period satisfies the Consulting Obligation;

(ii)    the Participant is excused from satisfying his Consulting Obligation for the prior 12-month period by the Employer or a Related Employer; or

(iii)    the Participant is unable to satisfy the Consulting Obligation for the 12-month period due to injury or illness as determined by the Employer or a Related Employer in its sole discretion.

(C)    If the Participant fails to satisfy his Consulting Obligation during any 12-month period for any reason other than (ii) or (iii) above, the installment payment otherwise payable with respect to such period shall be irrevocably forfeited.

(2)    Notwithstanding the foregoing, if the Participant incurs a disability during the period of his Consulting Obligation, the remainder of the Participant's benefit shall be paid to him in a lump sum as soon as practicable after such disability commences.

(3)    If the Participant dies during the period of his Consulting Obligation, the remainder of the Participant's benefit shall be paid to a Beneficiary in a lump sum as soon as practicable after his death.

(i)    **Forfeitures.**  Forfeited amounts under this Plan shall remain the property of the Employer or Related Employer or, if applicable, the trust established pursuant to Article V.

## ARTICLE VI

### Financing

(a)  **Financing**.  The benefits under this Plan, and the expenses of administering the Plan and maintaining any trust created pursuant to paragraph (d) of this Article IV, may be paid out of the general assets of the Employer or a Related Employer or any trust.

(b)  **No Trust Created**.  Nothing contained in this Plan, and no action taken pursuant to the provisions of this Plan, shall create or be construed to create a funded plan, a trust of any kind or a fiduciary relationship between the Employer or the Related Employer and the Participant, his Beneficiary or any other person.

(c)  **Unsecured Interest**.  The Participant shall not have any interest whatsoever in any specific asset of the Employer or Related Employer. To the extent that any person acquires a right to receive payments under this Plan, such right shall be no greater than the right of any unsecured general creditor of the Employer or Related Employer.

(d)  **Establishment of Trust**.

(1)  The Employer and a Related Employer may establish one or more trusts substantially in conformance with the terms of the model trust described in Revenue Procedure 92-64 to assist in meeting its obligations to Participants under this Plan. Except as provided in paragraph (b) above and the terms of the trust agreement, any such trust or trusts shall be established in such manner as to permit the use of assets transferred to the trust and the earnings thereon to be used by the trustee solely to satisfy the liability of the Employer or a Related Employer in accordance with the Plan.

(2)  The Employer or a Related Employer, in its sole discretion, and from time to time, may make contributions to the trust. Unless otherwise paid by the Employer or a Related Employer, all benefits under the Plan and expenses chargeable to the Plan shall be paid from the trust.

(3)  The powers, duties and responsibilities of the trustee shall be as set forth in the trust agreement and nothing contained in the Plan, either expressly or by implication, shall impose any additional powers, duties or responsibilities upon the trustee.

(e)  **Subject to Claims**.  The Plan constitutes an unsecured promise by the Employer or a Related Employer to pay benefits in the future. Participants employed by the Employer shall have the status of general unsecured creditors of the Employer. Participants employed by a Related Employer shall have the status of general unsecured creditors of such Related Employer. The Plan is unfunded for Federal tax purposes and for purposes of Title I of the Employee Retirement Income Security Act of 1974. All amounts credited to the Participants' Accounts will remain the general assets

of the Employer or a Related Employer and shall remain subject to the claims of the Employer's and the Related Employers' creditors until such amounts are distributed to the Participants.

# ARTICLE VII

## Amendment and Termination

(a) **Amendments and Termination**. The Plan may be amended at any time, or from time to time, by the Employer, and the Plan may be terminated at any time by the Employer. Any such amendment or termination shall be ratified and approved by the board of directors.

(b) **Effect of Amendment or Termination**.

(1) No amendment or termination of the Plan shall affect the rights of any Participant's Accrued Benefit as of the date of such amendment or termination.

(2) Upon termination of the Plan the Participants (or their Beneficiaries) shall be paid in a lump sum equal to the Actuarial Present Value of the Participant's Accrued Benefit, as soon as administratively practicable following such termination.

# ARTICLE VIII

## Miscellaneous

(a)   **Payments to Minors and Incompetents**.   If the Plan Administrator receives satisfactory evidence that a person who is entitled to receive any benefit under the Plan, at the time such benefit becomes available, is a minor or is physically unable or mentally incompetent to receive such benefit and to give a valid release therefore, and that another person or an institution is then maintaining or has custody of such person, and that no guardian, or other representative of the estate of such person shall have been duly appointed, the Plan Administrator may authorize payment of such benefit otherwise payable to such person to such other person or institution; and the release of such other person or institution shall be a valid and complete discharge for the payment of such benefit.

(b)   **Plan Not a Contract of Employment**.   The Plan shall not be deemed to constitute a contract between the Employer or a Related Employer and the Participant, nor be consideration for the employment of the Participant.   Nothing in the Plan shall give the Participant the right to be retained in the employ of the Employer or a Related Employer; the Participant shall remain subject to discharge or discipline as an employee to the same extent as if the Plan had not been adopted.

(c)   **Non-Alienation of Benefits**.   No benefit under the Plan shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance or charge, and any attempt to do so shall be void.   No benefit under the Plan shall in any manner be liable for or subject to the debts, contracts, liabilities, engagements or torts of any person.   If any person entitled to benefits under the Plan shall become bankrupt or shall attempt to anticipate, alienate, sell, transfer, assign, pledge, encumber or charge any benefit under the Plan, or if any attempt shall be made to subject any such benefit to the debts, contracts, liabilities, engagements or torts of the person entitled to any such benefit, except as specifically provided in the Plan, then such benefits shall cease and terminate at the discretion of the Plan Administrator.   The Plan Administrator may then hold or apply the same or any part thereof to or for the benefit of such person or any dependent or Beneficiary of such person in such manner and proportions as it shall deem proper.

(d)   **State Law**.   This instrument shall be construed in accordance with and governed by the laws of the State of Florida, to the extent not superseded by the laws of the United States.

(e)   **No Interest in Assets**.   Nothing contained in the Plan shall be deemed to give any Participant any equity or other interest in the assets, business or affairs of the Employer or a Related Employer.   No Participant in the Plan shall have a security interest in assets of the Employer or a Related Employer used to make contributions or pay benefits.

(f)     **Recordkeeping.**  Appropriate records shall be maintained for the purpose of the Plan, subject to the supervision and control of the Plan Administrator.

(g)     **Gender.**  Throughout this Plan, and whenever appropriate, the masculine gender shall be deemed to include the feminine and neuter; the singular, the plural; and vice versa.

(h)     **Liability Limited.**  In administering the Plan neither the Plan Administrator nor any officer, director or employee thereof, shall be liable for any act or omission performed or omitted, as the case may be, by such person with respect to the Plan; provided, that the foregoing shall not relieve any person of liability for gross negligence, fraud or bad faith.  The Plan Administrator, its officers, directors and employees shall be entitled to rely conclusively on all tables, valuations, certificates, opinions and reports that shall be furnished by any actuary, accountant, trustee, insurance company, consultant, counsel or other expert who shall be employed or engaged by the Plan Administrator in good faith.

(i)     **Protective Provisions.**  Each Participant shall cooperate with the Plan Administrator by furnishing any and all information requested by the Plan Administrator in order to facilitate the payment of benefits hereunder, taking such physical examinations as the Plan Administrator may deem necessary and taking such other relevant action as may be requested by the Plan Administrator.  If a Participant refuses so to cooperate or makes any material misstatement of information or nondisclosure of medical history, then no benefits will be payable hereunder to such Participant or his Beneficiary, provided that, in the Plan Administrator's sole discretion, benefits may be payable in an amount reduced to compensate the Employer or a Related Employer for any loss, cost, damage or expense suffered or incurred by the Employer or a Related Employer as a result in any way of such action, misstatement or nondisclosure.

**IN WITNESS WHEREOF,** this Plan is effective as of the date first written above and has been executed on the dates written below.

**INDUSTRIES TRAINING CORPORATION**

_10/01/01_

Date

By: _____

Its _Vice President Finance_

**"EMPLOYER"**

141001.6
5321.980527

VIII-2

## SEPARATION AGREEMENT AND RELEASE

This Separation Agreement and Release (hereinafter referred to as "Agreement") is entered into by and between WILLIAM R. NOBLE (hereinafter referred to as "Noble") and INDUSTRIES TRAINING CORPORATION/PRIDE ENTERPRISES, and its respective present, past and future affiliates, predecessors, heirs, successors, assigns, insurers, employers, parents, and subsidiaries (including, but not limited to, Labor Line, Inc.), and each and every one of their respective servants, officers, directors, employees, agents, owners, principals, controlling persons, limited and general partners, relatives, representatives, joint ventures, beneficiaries, trustees, shareholders, alter egos, attorneys and experts (hereinafter referred to collectively as "ITC").

WHEREAS, Noble has been employed by ITC in the position of President of Labor Line; and

WHEREAS, the parties have determined it is in their mutual interests that Noble no longer be employed by ITC; and

WHEREAS, the parties desire to fully and completely resolve and settle any and all claims, known and unknown, which the parties had, have or may have relating to the employment or cessation of employment of Noble by ITC.

1.      Noble hereby tenders his resignation from his employment effective January 7, 2002, and ITC accepts Noble's voluntary resignation effective that same date.

2.      NOW, THEREFORE, in consideration of the parties assuming the obligations as set forth below, and other than as to the express rights and obligations set forth in this Agreement, and in consideration of the provisions, promises, terms and conditions of this Agreement, both parties



EXHIBIT

2

do hereby EXPRESSLY AND UNCONDITIONALLY FULLY AND FINALLY RELEASE AND

FOREVER DISCHARGE each other and their respective servants, officers, directors, employees,

agents, controlling persons, relatives, representatives, joint ventures, beneficiaries, trustees, alter

egos, attorneys and experts, from any and all duties, claims, rights, complaints, charges, damages,

costs, expenses, attorney's fees, debts, demands, actions, obligations, liabilities, and cause of action,

of any and every kind, nature, and character whatsoever, whether known or unknown, whether

arising out of contract, tort, statute, settlement, equity or otherwise, whether known or unknown,

whether foreseen or unforeseen, whether past, present, or future, whether fixed, liquidated, or

contingent, which they ever had, has, or may in the future claim to have had against each other

based on any act or omission concerning any matter, cause, or thing arising prior to the date of this

Agreement and up to the time of execution of this Agreement by all parties, including but not

limited to, those directly or indirectly arising out of or relating or in any way pertaining to a claim of

discrimination or unlawful conduct arising under, as amended, the Florida Civil Rights Act, Title

VII of the Civil Rights Act, the Fair Labor Standards Act, the Americans with Disabilities Act, the

Age Discrimination in Employment Act, the Older Workers Benefit Protection Act, the Florida or

United States Constitution, or under any other federal, state or local statute or Act, ordinance,

regulation, custom, rule or policy, or any cause of action in common law, including but not limited

to actions in contract or tort, including any intentional torts, or any instruments, agreements, or

documents entered into by, between, or among the parties (save and except for any claim under

ERISA which may arise in the future).

    3.    It is further understood that in agreeing to this release, both parties mutually

hereby waive any and all rights or benefits which they have, had or may have under the:

(1) Florida Civil Rights Act of 1992, Americans with Disabilities Act, Title VII of the Civil Rights Act of 1964, as amended, Workers Adjustment and Retraining Notification Act, the Age Discrimination in Employment Act, the Older Workers Benefit Protection Act, or any amendments or revisions thereof or thereto; (2) any other federal, state or local law prohibiting discrimination or discharge from employment; and (3) any cause of action recognized at common law for employment discrimination or wrongful discharge, expressly including all claims and causes, whether at law or equity, contract or tort, including negligence.

4.     Noble, now and for the future, expressly waives, releases and surrenders any right or opportunity to and will not seek any relationship, including that of independent contractor, agent, or consultant, nor will he seek employment, reemployment or reinstatement to employment with ITC, its successors, assigns, parent, subsidiaries, affiliates and related companies, and further agrees that neither ITC nor any of the foregoing entities will, at any time, be under any obligation to employ or contract with him except as otherwise provided herein. Noble further agrees that should any application be made by him in contravention of the provisions of this Agreement, neither ITC nor any of the foregoing entities shall have any obligation to process that application or to hire or retain him in any manner, and that failure to process the application or to hire or retain him in any manner shall not constitute a violation of any local, state, or federal law, order or regulation, or this Agreement.

5.     Noble further agrees that he will refrain from conducting himself in a manner which (i) harasses or interferes with ITC and/or its officers, directors, agents and/or employees, or (ii) holds ITC, its officers, directors, agents and/or employees up to ridicule in the community or jeopardizes the business and/or reputation of ITC.

6.     Noble and ITC agree that the terms of this Agreement, specifically including but not limited to the fact that the parties have entered into a Separation Agreement, are confidential, and Noble and ITC further agree not to divulge such terms, other than to their respective accountants, attorneys, the Internal Revenue Service, or as otherwise required by law; provided, however, that ITC may disclose such information to the extent necessary based on legitimate business reasons. Nothing herein is intended to preclude Noble from disclosing that he resigned his employment to pursue other interests, so long as the existence of this Agreement is not disclosed or the fact that a severance payment was made. The foregoing covenant not to disclose shall be binding upon both parties, their attorneys, and those to whom they may disclose the terms of this Agreement for income tax reporting purposes. The agreement of Noble and ITC to be bound is indicated by their respective signatures affixed hereto. Their signatures hereto also indicate their agreement that this provision is a material element of the Agreement and is consideration for ITC entering into this Agreement. In the event that any party or representative of a party receives a demand to disclose such information under actual or potential compulsion of legal process, the other party shall be promptly notified in writing, with such notification also being made to counsel for the respective parties to this Agreement. The party or representative to whom the demand is made shall also notify the person or entity making the demand in writing that the information sought is confidential and that the other parties to the Agreement request an opportunity to consider and possibly to object to the demand and shall provide those parties with a copy of such notification.

7.     In further consideration of the agreements above, ITC agrees to provide to Noble separation pay in an amount equal to one year of salary of Noble's current regular pay

($150,000.00), less applicable deductions as required by law. Payment of the foregoing sums shall be made in one lump-sum payment, which shall be payable within thirty (30) days from ITC counsel's timely receipt of the signed and notarized original of this Agreement bearing Noble's signature. The above-described terms of this Agreement only become operative upon the payment of the aforementioned sums.

8.      In addition to the foregoing payment enumerated in Paragraph 7 above, and in further consideration of the terms and conditions of this Agreement herein, ITC agrees that Noble shall be entitled to retain all monetary payments, including but not limited to any and all severance payments, that he has already received from ITC as of the effective date of this Agreement.

9.      ITC further agrees to provide Noble with six (6) months of out-placement services through ITC's outplacement program. Noble understands and agrees that he is responsible for complying with the terms and requirements of ITC's out-placement services, and that ITC does not guarantee or promise any employment results or opportunities as a result of Noble's use of the out-placement services.

10.     As further consideration for this Agreement, ITC agrees that Noble shall maintain his vested interest in ITC's SERP plan.

11.     In agreeing to the terms of this Agreement and by paying the consideration set forth above, neither ITC nor the Released Parties admit any liability to Noble, whether arising out of Noble's employment relationship or cessation thereof with ITC and the Released Parties or otherwise, and ITC and the Released Parties hereby expressly deny the existence of any such liability. Noble further agrees that ITC and the Released Parties have not incurred any liability to

Noble, whether arising out of Noble's employment relationship or cessation thereof with ITC and the Released Parties or otherwise.

12.    In the event of litigation between the parties hereto, their successors or assigns, arising out of or in connection with this Agreement, the prevailing party in any such action shall be entitled to receive reasonable attorney's fees and costs and appellate attorney's fees and costs incurred in connection therewith. The venue of any claim or complaint arising out of this Agreement shall be in Pinellas County, Florida. However, each Party hereby agrees to waive the right to seek any additional payment of attorneys' fees or costs incurred in connection with the subject matter of this Agreement prior to the effective date of this Agreement.

13.    Noble and ITC agree that this Agreement supersedes all other prior agreements between them, and Noble understands and agrees that the terms and conditions of this Agreement constitute the full and complete understandings, agreements, and promises of the parties, and that there are no oral or written understandings, agreements, promises, or inducements made or offered other than those set forth herein. The undersigned parties acknowledge that they have each read the Agreement and that they are fully aware of its meaning, contents, and of its significance and legal effect. The parties each acknowledge that they have entered into this Agreement knowingly, voluntarily, and after having a reasonable time to consider its terms and importance.

14.    Noble understands that he is not entitled to receive any of the benefits outlined in this Agreement if he does not sign the Agreement, and he understands that he may revoke this Agreement within seven (7) days of signing it. To be effective, this revocation must be in writing and received by either facsimile transmission or United States Mail by counsel for ITC within the seven-day revocation period. Noble understands that if he revokes this Agreement, as

outlined above, that this Agreement will not be effective or enforceable and he will not be eligible to receive any benefits under this Agreement.

15.     Should any provision of this Agreement be declared or determined to be illegal, invalid, or unenforceable, the legality, validity, and enforceability of the remaining parts, terms or provisions shall not be effected thereby, and said illegal, unenforceable, or invalid part, term or provision, shall be deemed not to be part of this Agreement.

16.     This Separation Agreement and Release may be executed in several counterparts, each of which shall be deemed an original.

17.     The parties hereby agree to execute whatever documents are reasonably required to facilitate or effectuate this Agreement.

18.     This Agreement may not be changed or altered except by a writing signed by both Noble and the President or other authorized representative of ITC.

19.     Noble represents and warrants that he has entered into this Agreement voluntarily, and that he is authorized to enter into and has the authority to perform the terms of this Agreement. Noble further represents and warrants that he has not sold, assigned, transferred, conveyed or otherwise disposed of all or any portion of the Released Claims.

20.     NOBLE ACKNOWLEDGES THAT HE HAS READ AND UNDERSTANDS ALL OF THE TERMS OF THIS AGREEMENT. NOBLE HAS BEEN ADVISED TO CONSULT, AND HAS CONSULTED WITH, AN ATTORNEY PRIOR TO SIGNING THIS AGREEMENT. NOBLE UNDERSTANDS THAT WHETHER OR NOT HE CONSULTS WITH AN ATTORNEY IS HIS DECISION. NOBLE HAS BEEN OFFERED THE OPPORTUNITY TO TAKE UP TO 21 DAYS TO CONSIDER THIS AGREEMENT.

IN WITNESS WHEREOF, the parties have executed this Agreement.


Date: _March 7, 2002_____          _William R. Noble_____

                                       **WILLIAM R. NOBLE**


State of Florida                    }
                                    }
County of Pinellas                  }

        Sworn to and subscribed before me this ___7th___ day of ___March_____, 2002, by
WILLIAM R. NOBLE, who is personally known to me or who has produced _FL Dr.License._
_N140 936474 270_____ as identification.

                                       _Beth R. Sedacca_____
                                       Notary Public

                                       _Beth R. Sedacca_____
                                       Printed Name and Commission #/Exp.

Beth R. Sedacca
MY COMMISSION # CC828667 EXPIRES
May 7, 2003
BONDED THRU TROY FAIN INSURANCE, INC.


**INDUSTRIES TRAINING CORPORATION/
PRIDE ENTERPRISES**


Date: _3/14/02_____          By: _____
                                 Print Name: _PAMELA JO DAVIS_____
                                 Print Title: _PRESIDENT_____


State of Florida                    }
                                    }
County of Pinellas                  }

        Sworn to and subscribed before me this _12th_ day of _March_____, 2002, by
_Pamela Jo Davis___, as _President_ of Industries Training Corporation/
Pride Enterprises, who is personally known to me or who has produced _____
_____ as identification.

                                       _Chris Brasfield_____
                                       Notary Public

                                       _Chris Brasfield_____
                                       Printed Name and Commission #/Exp.

CHRIS BRASFIELD
MY COMMISSION # CC 766127
EXPIRES: August 28, 2002
Bonded Thru Notary Public Underwriters